O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES F. DODARO, as an individual and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STANDARD PACIFIC CORP., et al.,<br><br>Defendants. | Case Nos. EDCV 09-01666-VAP (DTBx); EDCV 09-01668-VAP (DTBx); EDCV 09-01669-VAP (DTBx); EDCV 09-01670-VAP (DTBx); *EDCV 09-01671-VAP* (DTBx); EDCV 09-01672-VAP (DTBx); EDCV 09-01673-VAP (DTBx); EDCV 09-01674-VAP (DTBx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>**[Motion filed on December 22, 2011]** |

Plaintiffs in these eight cases allege Defendants gulled them, and many others, into buying houses in neighborhoods populated by subprime mortgagors and investors.[1]  With the collapse of the housing market,

_____

[1] Plaintiffs are James Dodaro (No. 09-1666); Stella Stephens and Timothy Young (No. 09-1668); Edilberto Lumalu, Brian Dietz, Brenda Dietz, and Candice McDonald (No. 09-1669); Gaspare Oneto, Paul Nakabayashi, Sandra Nakabayashi, John Butler, and Linda Butler (No. 09-1670); Sylvester Maya and Ofer Masachi (No. 09-1671); Remedios Martinez (No. 09-1672); Matthew Nielsen and Nicole
(continued...)

1    Plaintiffs allege such neighborhoods became seas of empty

2    houses, the owners of which were either forced out by

3    foreclosures, or decided rationally to abandon their

4    investments rather than pay off debts greater than their

5    properties' values.  As Plaintiffs' neighborhoods were

6    blighted with abandoned houses, the value of their own

7    houses declined.  While admitting this phenomenon is

8    widespread in the current housing market, Plaintiffs

9    allege it had an especially pernicious effect in their

10   neighborhoods, where Defendants sold houses zealously to

11   buyers who could not afford them.  Saddled with their own

12   devalued houses, Plaintiffs brought this putative

13   nationwide class action against Defendants.

14

15       Defendants, for their part, insist they did nothing

16   improper as a matter of law, that they owed no duty to

17   disclose to Plaintiffs the financial wherewithal of their

18   neighbors, and in any event, the statute of limitations

19   has run on Plaintiffs' claims (each of these arguments

20

21 ───────────────────

22       [1](...continued)
     Nielsen (No. 09-1673); and Solomon Kelly and James Molina
     (No. 09-1674).

23
         Defendants are Standard Pacific Corp. (No. 09-1666);
24   Lennar Corp. and Lennar Homes of California, Inc. (No.
     09-1668); Richmond American Homes Corp., M.D.C. Holdings,
25   Inc., and Richmond American Homes of Maryland, Inc. (No.
     09-1669); The Ryland Group, Inc. and Ryland Homes of
26   California, Inc. (No. 09-1670); Centex Corp., Centex
     Homes Corp., and Centex Homes, G.P. (No. 09-1671); D.R.
27   Horton, Inc. (No. 09-1672); Shea Homes, Inc. and J.F.
     Shea Co., Inc. (No. 09-1673); and Beazer Homes USA, Inc.
28   and Beazer Homes Holding Corp. (No. 09-1674).

1  calling for dismissal for failure to state a claim, per

2  Federal Rule of Civil Procedure 12(b)(6)).  As an initial

3  matter, Defendants also argue Plaintiffs cannot

4  demonstrate that Defendants' practices led to the

5  devaluation of their houses, and consequently lack

6  standing to sue (calling for dismissal pursuant to

7  Federal Rule of Civil Procedure 12(b)(1)).  Defendants

8  therefore filed Motions to Dismiss, which the Court

9  GRANTS, without leave to amend, for the reasons discussed

10 below.[2]

11

12                         **I. BACKGROUND**

13 **A.   Factual Background**

14      In the early years of this century, low interest

15 rates stimulated demand for new houses among prospective

16 buyers, and various companies built entirely new

17 residential neighborhoods to supply that demand.[3]

18 _____

19      [2] Consequently, the Court DENIES AS MOOT Defendants'
   Motions to Strike.

20      [3] In deciding Defendants' Motions, the Court takes as
21 true facts pled by Plaintiffs, Colony Cove Properties,
   LLC v. City of Carson, 640 F.3d 948, 955 (9th Cir. 2011),
22 as well as adjudicative facts that are subject to
   judicial notice, id.; see Fed. R. Evid. 201.
23 "'Adjudicative facts are facts about the parties and
   their activities, businesses, and properties, usually
24 answering the questions of who did what, where, when,
   how, why, with what motive or intent; adjudicative facts
25 are roughly the kind of facts that go to a jury in a jury
   case.'"  Marshall v. Sawyer, 365 F.2d 105, 111 (9th Cir.
26 1966) (quoting Kenneth Culp Davis, The Requirement of a
   Trial-Type Hearing, 70 Harv. L. Rev. 193, 199 (1956)).
27 Where, as here, the Court discusses facts not relied upon
   for its disposition of the case, it does so to place the
28                                         (continued...)

Defendants were among those companies:  Defendant Standard Pacific Corp. sold over 30,000 houses around the country between 2004 and 2006 (see Second Am. Compl. ("Dodaro SAC") (Case No. 09-1666, Doc. No. 73) ¶ 13); Defendant Lennar Corp., over 120,000 (see Second Am. Compl. ("Stephens SAC") (Case No. 09-1668, Doc. No. 68) ¶ 16); Defendant M.D.C. Holdings, Inc., over 40,000 (Second Am. Compl. ("Lumalu SAC") (Case No. 09-1669, Doc. No. 55) ¶ 18); Defendant The Ryland Group, Inc., more than 47,000 (Second Am. Compl. ("Oneto SAC") (Case No. 09-1670, Doc. No. 59) ¶ 18); Defendant D.R. Horton, Inc., nearly 150,000 (Second Am. Compl. ("Martinez SAC") (Case No. 09-1672, Doc. No. 71) ¶ 14); and Defendant Beazer Homes Holdings Corp., over 50,000 (Second Am. Compl. ("Kelly SAC") (Case No. 09-1674, Doc. No. 60) ¶ 16).

Not only were companies building and selling large numbers of houses; Plaintiffs allege companies like Defendants were vertically integrating their businesses to finance those sales, themselves.  (See Dodaro SAC ¶¶

---

[3](...continued)
matter in context for the reader; in any event, that low interest rates stimulated a demand for houses, which were built in large numbers shortly after the turn of the century, is by now something "'like the obvious fact that surgery is painful and can have dire consequences,'" and therefore not a forbidden observation, United States v. Berber-Tinoco, 510 F.3d 1083, 1091 (9th Cir. 2007) (quoting United States v. Mariscal, 285 F.3d 1127, 1131-32 (9th Cir. 2002)).

15-21, 24.)[4]  Consequently, Defendants were able to build, appraise, advertise, broker the sales of, and finance houses.  (Id. ¶ 24.)  Owing in part to this vertical integration, Defendants were able to finance the sale of the houses they built to subprime borrowers: people who, though "cash-poor," would find themselves "house-rich" in a market where housing prices continued to rise.  (See id. ¶ 26; In re First Alliance Mortg. Co., 471 F.3d 977, 984 (9th Cir. 2006) (discussing the practice of subprime lending).)  Plaintiffs contend they thus found themselves in neighborhoods "saturat[ed]" with people who paid only 10 percent of the price of their houses, borrowing 90 percent against the properties themselves (see Dodaro SAC ¶ 27).  Those buyers staked the collateral – their houses – on the notion that the increasing equity in the houses would exceed the debt secured by the houses rapidly.

Plaintiffs were unaware their neighborhoods were filled with such buyers, whom they view as generally "not qualified" to borrow large amounts of money.  (See id. ¶¶ 26-27.)  Defendants instead led Plaintiffs to believe they were buying houses in "traditional neighborhoods with stable owners who occupied their homes and who were

_____

[4] For propositions that are substantially similar across the eight sets of pleadings in Plaintiffs' case, the Court relies on Plaintiff Dodaro's Second Amended Complaint, and will distinguish among Plaintiffs' pleadings only when necessary on a particular point.

vested in the community and neighborhood."  (Id. ¶ 30.)
To Plaintiffs, it was "[i]mplicit" that Defendants were
"making a good-faith effort to sell homes to buyers
[they] expected could afford to buy the houses and would
be stable neighbors."  (Id.)

Bolstering this expectation, Defendants "repeatedly
represented that the homes they were selling were single-
family homes that were designed and located in
communities that are optimal for buyers with families
that would occupy the homes," and "that only buyers who
intended to occupy the homes as their primary residence
for at least one year would be permitted to purchase
homes in these developments . . . ."  (Id. ¶¶ 31-32.)
Further convincing Plaintiffs that Defendants were
policing the stability of their neighborhoods, Defendants
required buyers to submit financing materials (or to
finance the purchases through Defendants' own mortgage
subsidiaries), "to ensure that buyers were qualified to
purchase their homes."  (Id. ¶ 35.)

Having been involved in the financing of the houses
they were selling, Defendants were in a position to know
that they were selling houses to "unqualified" or "high-
foreclosure-risk buyers," but they did not disclose the
presence of those buyers to Plaintiffs, who therefore
paid more than they would have if they had known of the

1   unqualified buyers in their midst.  (Id. ¶¶ 40-43, 53.)
2   Plaintiffs entered into contracts to purchase houses (all
3   in Riverside County or adjacent San Bernardino County)
4   from Defendants:  Plaintiff James Dodaro on July 24, 2005
5   (id. ¶ 56); Plaintiff Stella Stephens on June 25, 2005
6   (Stephens SAC ¶ 57) and Plaintiff Timothy Young on July
7   22, 2006 (id. ¶ 67); Plaintiff Edilberto Lumalu on June
8   4, 2005 (Lumalu SAC ¶ 61), Plaintiffs Brian and Brenda
9   Dietz on November 10, 2005 (id. ¶ 67), and Plaintiff
10  Candice McDonald on March 12, 2006 (id. ¶ 75); Plaintiff
11  Gaspare Oneto on January 27, 2005 (Oneto SAC ¶ 58),
12  Plaintiffs Paul and Sandra Nakabayashi on August 16, 2006
13  (id. ¶ 67), and Plaintiffs John and Linda Butler on
14  September 30, 2005 (id. ¶ 76); Plaintiff Sylvester Maya
15  and Plaintiff Ofer Masachi in June 2005 (Corrected Second
16  Am. Compl. ("Maya SAC") (Case No. 09-1671, Doc. No. 77-1)
17  ¶¶ 58, 69); Plaintiff Remedios Martinez on May 23, 2006
18  (Martinez SAC ¶ 55; Plaintiffs Matthew and Nicole
19  Nielsen on April 29, 2006 (Second Am. Compl. ("Nielsen
20  SAC") (Case No. 09-1673, Doc. No. 57) ¶ 57); Plaintiff
21  Solomon Kelly on June 11, 2005 (Kelly SAC ¶ 59) and
22  Plaintiff James Molina in January 2006 (id. ¶ 68).
23
24
25
26
27
28

And then the demand for new houses evaporated.  The
value of existing houses began to spiral downward, houses
hemorrhaged the equity that made them viable collateral
for subprime lending, and neighborhoods with many heavily
leveraged owners suffered commensurately large numbers of
foreclosures and short sales (see Dodaro SAC ¶ 3).
Owners either walked away from investments that now cost
more than they were worth, or were evicted after losing
the means of paying their residential loans in a
collapsing economy.

Thereafter, Plaintiffs realized they were in
neighborhoods populated heavily with subprime buyers and
investors; the vacant houses left by departure of those
owners depressed the values of Plaintiffs' property
excessively.  (Id. ¶¶ 45-47.)  Thus, Plaintiffs, who were
"qualified and low-foreclosure-risk buyers," and "who did
everything right," suffered grievous economic damage.
(Id. ¶ 45.)  Plaintiffs therefore brought this lawsuit.

**B.  Procedural History**

Plaintiffs first filed Complaints on September 3,
2009; they amended their Complaints on December 21, 2009.
Plaintiffs' First Amended Complaints made five claims
against Defendants:  (1) for unfair business practices
under California Business and Professions Code §§ 17200,
et seq.; (2) for false advertising under California

Business and Professions Code §§ 17500, _et seq._; (3) for fraud; (4) for negligent misrepresentation; and (5) for breach of the covenant of good faith and fair dealing. (_See, e.g._, First Am. Compl. (Case No. 09-1666, Doc. No. 32).)

On April 1, 2010, the Court granted Defendants' Motions to Dismiss Plaintiffs' First Amended Complaints, with prejudice, holding that Plaintiffs failed to demonstrate they had standing to sue in federal court. As Article III of the United States Constitution empowers federal courts to hear only "cases" and "controversies," _see_ U.S. Const. art. III, § 2, matters must satisfy the various justiciability criteria, like standing, developed for determining whether a matter is a case or controversy.  Demonstrating standing requires a plaintiff to show that he has suffered, or imminently will suffer, an injury that is "concrete and particularized," can be fairly traced back to the defendant's conduct, and can be redressed by a court's favorable resolution of the matter.  _Lujan v. Defenders of Wildlife_, 504 U.S. 555, 560-61 (1992).  The Court held that Plaintiffs failed to plead a cognizable injury because any reduction in the value of their houses would not be concrete until they tried to sell those houses, and any claim that Plaintiffs overpaid for their houses because of Defendants' conduct likewise depended too much on economic fluctuations to be

concrete.  Dodaro v. Standard Pac. Corp., No. EDCV 09-
01666-VAP (OPx), 2010 WL 1330889, at *4-*8 (C.D. Cal.
Apr. 1, 2010).  The Court further held that Plaintiffs
failed to plead adequately that Defendants caused any
injury they may have suffered, because the array of
prevailing economic factors and general decline of the
housing market tied in knots any chain of causation
linking Plaintiffs' alleged injuries to Defendants'
conduct.  Id. at *8-*11.

    Plaintiffs appealed.  The court of appeals held
Plaintiffs alleged standing adequately as to injuries
that occurred at the time they bought their houses, i.e.,
damages that accrued when Plaintiffs paid more than they
would have for the houses they bought.  Maya v. Centex
Corp., 658 F.3d 1060, 1069-70 (9th Cir. 2011).  It
further held Plaintiffs alleged a cognizable injury when
they stated the current value of their properties had
been reduced inordinately by Defendants' sales practices,
even though Plaintiffs had yet to sell their houses.  Id.
at 1071.  In any event, the court of appeals observed,
the excessive blight caused by the extraordinary number
of foreclosures Plaintiffs attributed to Defendants'
conduct was a concrete injury.  Id. at 1071-72.

1     But whether the foreclosures in Plaintiffs'
2  neighborhoods could be attributed properly to Defendants'
3  sales practices was a question left open by the court of
4  appeals, which held Plaintiffs "have not established how
5  [Defendants'] actions _necessarily_ result in foreclosure
6  . . . ."  _Id._ at 1072 (emphasis in original).[5]  The court
7  of appeals therefore remanded the case to this Court,
8  with instructions to "permit" Plaintiffs "to amend their
9  complaint and attach expert testimony on causation" as to
10 the alleged devaluation of their houses.  _Id._ at 1073.

11

12    On December 2, 2011, Plaintiffs filed eight Second
13 Amended Complaints purporting to address the issue
14 identified by the court of appeals and raising the same
15 five claims they raised in their First Amended
16 Complaints.  On December 22, Defendants filed Motions to
17 Dismiss Plaintiffs' Second Amended Complaints and
18 simultaneously, Motions to Strike various portions of
19 Plaintiffs' pleadings.  On January 9, 2012, Plaintiffs
20 filed timely Oppositions, and on January 18, 2012,
21 Defendants filed Replies.  Both Plaintiffs and Defendants
22 split the issues they briefed among the various
23 Plaintiffs and Defendants; each Plaintiff and Defendant

24

25        [5] The court of appeals observed that Plaintiffs
26 alleged only that foreclosures on neighboring houses
   caused the devaluation of their own houses, and not that
27 Plaintiffs' houses lost value based on "the _risk_ posed by
   their neighbors (even absent foreclosures)."  _Maya_, 658
28 F.3d at 1072.

1  incorporated portions of other Plaintiffs' and
2  Defendants' briefing by reference.
3
4      The principal arguments Defendants advance are:  (1)
5  Plaintiffs still have not demonstrated the causal
6  connection between Defendants' conduct and Plaintiffs'
7  injury necessary to show standing to sue (see Mot. to
8  Dismiss ("Stephens MTD") (Case No. 09-1668, Doc. No. 74)
9  at 20-25; Mot. to Dismiss ("Martinez MTD") (Case No. 09-
10  1672, Doc. No. 77) at 20-22; Mot. to Dismiss ("Kelly
11  MTD") (Case No. 09-1674, Doc. No. 65) at 7-8); (2) the
12  statute of limitations has expired on Plaintiffs' fraud
13  claims (see Mot. to Dismiss ("Maya MTD") (Case No. 09-
14  1671, Doc. No. 69) at 21-23); (3) Defendants' allegedly
15  fraudulent statements about the character of Plaintiffs'
16  neighborhoods were puffery (see Maya MTD at 15-17;
17  Martinez MTD at 9-10; Mot. to Dismiss ("Nielsen MTD")
18  (Case No. 09-1673, Doc. No. 59-1) at 10-12); (4)
19  Plaintiffs could not have relied on those statements
20  reasonably in buying their houses (see Mot. to Dismiss
21  ("Lumalu MTD") (Case No. 09-1669, Doc. No. 56) at 17-18;
22  Mot. to Dismiss ("Oneto MTD") (Case No. 09-1670, Doc. No.
23  64) at 16-19; Martinez MTD at 12-14; Nielsen MTD at 16-
24  17); (5) in any event, Plaintiffs fail to plead fraud
25  with the requisite specificity (see Stephens MTD at 6-8;
26  Oneto MTD at 7-10; Maya MTD at 23-24; Nielsen MTD at 8-
27  10; Kelly MTD at 17-20); and (6) Defendants had no duty
28

to disclose the facts Plaintiffs allege they fraudulently concealed (<u>see</u> Stephens MTD at 10-12; Lumalu MTD at 12-15; Maya at 18-19; Nielsen at 12-16).

The Court analyzes Defendants' standing argument as a challenge to its subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1); the remaining arguments go to Plaintiffs' ability to state a claim, and are analyzed pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court thus sets forth the standards for applying those two rules.

## II. LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss an action if the court lacks jurisdiction over the subject matter of the suit. Fed. R. Civ. P. 12(b)(1).  The party seeking to invoke federal jurisdiction bears the burden of establishing that jurisdiction exists.  <u>Scott v. Breeland</u>, 792 F.2d 925, 927 (9th Cir. 1986).  A complaint will be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction if (1) the cause does not "arise under" any federal law or the United States Constitution, (2) there is no "case or controversy" within the meaning of that constitutional term, or (3) the cause is not one

1   described by any jurisdictional statute.   <u>Baker v. Carr</u>,

2   369 U.S. 186, 198 (1962).

3

4   **B.   Federal Rule of Civil Procedure 12(b)(6)**

5        Federal Rule of Civil Procedure 12(b)(6) allows a

6   party to bring a motion to dismiss for failure to state a

7   claim upon which relief can be granted.   Rule 12(b)(6) is

8   read in conjunction with Rule 8(a), which requires only a

9   short and plain statement of the claim showing that the

10  pleader is entitled to relief.   Fed. R. Civ. P. 8(a)(2);

11  <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957) (holding that

12  the Federal Rules require that a plaintiff provide "'a

13  short and plain statement of the claim' that will give

14  the defendant fair notice of what the plaintiff's claim

15  is and the grounds upon which it rests.") (quoting Fed.

16  R. Civ. P. 8(a)(2)); <u>Bell Atlantic Corp. v. Twombly</u>, 550

17  U.S. 544, 555 (2007).   When evaluating a Rule 12(b)(6)

18  motion, a court must accept all material allegations in

19  the complaint – as well as any reasonable inferences to

20  be drawn from them – as true, and construe them in the

21  light most favorable to the non-moving party.   <u>See</u> <u>Doe v.</u>

22  <u>United States</u>, 419 F.3d 1058, 1062 (9th Cir. 2005); <u>ARC</u>

23  <u>Ecology v. U.S. Dep't of Air Force</u>, 411 F.3d 1092, 1096

24  (9th Cir. 2005); <u>Moyo v. Gomez</u>, 32 F.3d 1382, 1384 (9th

25  Cir. 1994).

26

27

28

1      "While a complaint attacked by a Rule 12(b)(6)
2  motion to dismiss does not need detailed factual
3  allegations, a plaintiff's obligation to provide the
4  'grounds' of his 'entitlement to relief' requires more
5  than labels and conclusions, and a formulaic recitation
6  of the elements of a cause of action will not do."
7  Twombly, 550 U.S. at 555 (citations omitted).  Rather,
8  the allegations in the complaint "must be enough to raise
9  a right to relief above the speculative level."   Id.
10

11      To survive a motion to dismiss, a plaintiff must
12  allege "enough facts to state a claim to relief that is
13  plausible on its face."  Twombly, 550 U.S. at 570;
14  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949
15  (2009).  "The plausibility standard is not akin to a
16  'probability requirement,' but it asks for more than a
17  sheer possibility that a defendant has acted unlawfully.
18  Where a complaint pleads facts that are 'merely
19  consistent with' a defendant's liability, it stops short
20  of the line between possibility and plausibility of
21  'entitlement to relief.'"  Iqbal, 129 S. Ct. at 1949
22  (quoting Twombly, 550 U.S. at 556).  Recently, the Ninth
23  Circuit clarified that a complaint must (1) "contain
24  sufficient allegations of underlying facts to give fair
25  notice and to enable the opposing party to defend itself
26  effectively" and (2) "the factual allegations that are
27  taken as true must plausibly suggest an entitlement to
28

relief, such that it is not unfair to require the opposing the party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), and "take judicial notice of matters of public record outside the pleadings," Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988).

## III. DISCUSSION

Subject-matter jurisdiction is the sine qua non of proceeding in federal court; consequently, the Court begins by analyzing Defendants' challenge to Plaintiffs' standing to sue.  Finding Plaintiffs have alleged the necessary facts to establish standing (see infra Section A), the Court turns next to Defendants' argument that Plaintiffs' fraud-related claims are time-barred.  As discussed below, the Court concludes Plaintiffs fail to plead adequately when they discovered Defendants' alleged fraud.  (See infra Section B.)

The Court will not, however, grant Plaintiffs leave to amend their pleadings again to correct this error, because the amendment would be futile:  the Court concludes that Plaintiffs otherwise fail to state any claim on which relief can be granted, for the reasons discussed below.  (See infra Sections C-F.)  The Court therefore GRANTS Defendants' Motions to Dismiss, without leave to amend.

**A.   Plaintiffs Establish Standing Successfully**

As discussed above, to demonstrate his standing to sue, a plaintiff must show he has suffered (or will suffer imminently) a concrete and particular injury, traceable to the defendant's conduct, and redressable by the court.  Lujan, 504 U.S. at 560-61.  The strength required of the plaintiff's showing is commensurate with when in the litigation it is made; "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ."  Id. at 561; see, e.g., Cent. Delta Water Agency v. United States, 306 F.3d 938, 947 (9th Cir. 2002) (observing that even at the summary judgment stage, a plaintiff need not prove standing, but instead demonstrate merely "that there is a genuine question of material fact as to the standing elements").  Plaintiffs now carry that burden successfully.

1      Previously, this Court concluded Plaintiffs failed to

2  allege standing adequately because they failed to allege

3  concrete and particular injuries, and failed to causally

4  link those injuries to Defendants' conduct.  The Ninth

5  Circuit reversed and remanded, leaving to this Court to

6  determine whether, after amending their pleadings,

7  Plaintiffs can establish a causal connection between

8  Defendants' alleged acts and the devaluation of

9  Plaintiffs' houses (or the surrounding blight).  <u>See</u>

10  <u>Maya</u>, 658 F.3d at 1072-73.

11

12      Plaintiffs now adequately allege a causal connection

13  between Defendants' behavior and the diminished value of

14  their houses.  Citing "[a]n analysis performed by an

15  economist," Plaintiffs allege that if in 2006, a buyer in

16  Riverside County purchased a house from a builder that

17  sold 70 percent of its houses to buyers who financed 90

18  percent or more of the cost of their houses, a buyer

19  could expect to receive $60,000 less for his house than

20  would someone who purchased a house from a builder that

21  sold only 20 percent of its houses to such heavily

22  leveraged buyers.[6]  (<u>See</u> Dodaro SAC ¶ 47.)

23  _____

24      [6] The diminution in the value of Plaintiffs' houses
   therefore is not traceable directly to Defendants'
25  alleged failure to disclose the presence of subprime
   mortgagors; it is instead traceable directly to
26  Defendants' decision to sell to so many subprime
   mortgagors in the first place.  Though that decision is
27  not, itself, culpable conduct, for the purpose of the
   standing inquiry, the culpability of a defendant's
28                                          (continued...)

Defendants contend this allegation is insufficient to establish the requisite connection between Defendants' alleged sales to subprime mortgagors and the subsequent devaluation of the Homebuyers' property, for two reasons. First, Defendants argue Plaintiffs' allegation defies the Ninth Circuit's instruction that Plaintiffs "attach expert testimony on causation," Maya, 658 F.3d at 1073, and is contrary to Plaintiffs' representation that their Second Amended Complaints would demonstrate causation by "attaching an expert report" (Joint Case Mgmt. Statement (Case No. 09-1666, Doc. No. 67) at 11).  (See Stephens MTD at 22.)  Second, Defendants argue Plaintiffs' allegation lacks substance, as it does not address Defendants' conduct and instead is directed at builders in general.  (See id. at 23-24.)

As an initial matter, Plaintiffs' standing to seek relief for devaluation of their houses is no longer a dispositive issue in this case.  The court of appeals concluded already that Plaintiffs have standing to seek relief on the separate premise that they never would have

_____

[6](...continued)
conduct is immaterial; the only question is whether the conduct caused the plaintiff's injury, not whether it can form the basis of a meritorious claim.  See Catholic League for Religious & Civil Rights v. City & Cnty. of S.F., 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc) (distinguishing standing analysis, "which prevents a claim from being adjudicated for lack of jurisdiction," from merits analysis, "which determines whether a claim is one for which relief can be granted if factually true").

purchased their houses in the first place, had Defendants
disclosed the number of highly leveraged buyers in their
neighborhoods, <u>see</u> <u>Maya</u>, 658 F.3d at 1069-70.  <u>See</u>
<u>Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),</u>
<u>Inc.</u>, 528 U.S. 167, 185 (2000) ("[A] plaintiff must
demonstrate standing separately for each form of relief
sought."); <u>see, e.g.</u>, <u>City of Los Angeles v. Lyons</u>, 461
U.S. 95, 109 (holding that a plaintiff had standing to
seek damages for an injury even if he lacked standing to
seek injunctive relief on the basis of the same injurious
conduct); <u>Sacks v. Office of Foreign Assets Control</u>, 466
F.3d 764, 771-72 (9th Cir. 2006) (distinguishing among a
plaintiff's claims for the purpose of determining those
he lacks standing to assert).

     The Court turns to Defendants' first argument, that
Plaintiffs fail to attach to their pleadings an expert
report "distinguishing the effect of defendants' actions
from general economic influences," <u>Maya</u>, 658 F.3d at
1072-73, and therefore fail to meet the court of appeals
requirement for establishing standing.  (<u>See</u> Stephens MTD
at 23.)  As the court of appeals noted, "[e]xpert
testimony can be used to explain the causal connection
between defendants' actions and plaintiffs' injuries,
even in the context of other market forces." <u>Maya</u>, 658
F.3d at 1073 (citing <u>Barnum Timber Co. v. U.S. Envtl.</u>
<u>Protection Agency</u>, 633 F.3d 894, 900-01 (9th Cir. 2011)).

Just because expert testimony can be used to explain a
causal connection, however, does not mean that expert
testimony must be used to explain that connection, a
requirement that would fly in the face of the policy that
"'general factual allegations of injury resulting from
the defendant's conduct may suffice'" to demonstrate
standing at the pleading stage, <u>Maya</u>, 658 F.3d at 1068
(quoting <u>Lujan</u>, 504 U.S. at 561).  Thus, the court of
appeals elsewhere held that when a plaintiff both
"allege[s] specific facts plausibly explaining causality
and supported by competent declarations," the plaintiff
"<u>more than [meets] its burden</u> to demonstrate the causal
connection element of Article III standing at the
pleading stage." <u>Barnum Timber</u>, 633 F.3d at 899
(emphasis added).

The Ninth Circuit found that on the basis of their
First Amended Complaints, Plaintiffs failed to allege the
requisite causal connection between their houses'
depreciation and Defendants' conduct, but "permitting
[Plaintiffs] to amend their complaint[s] and attach
expert testimony on causation," <u>Maya</u>, 658 F.3d at 1073,
is not the same as requiring Plaintiffs to attach expert
testimony on causation – as long as Plaintiffs otherwise
amend their complaints in a manner sufficient to allege a
causal connection.  An otherwise satisfactory allegation
is not lacking simply because Plaintiffs did not provide

21

1  the expert report they discussed in the Joint Case

2  Management Statement.

3

4      Thus the Court turns to Defendants' second argument,

5  i.e., that Plaintiffs' allegation of a causal connection

6  between Plaintiffs' injuries and Defendants' conduct

7  remains insufficient, expert report or not.  Defendants

8  make much of the fact that linking one of many possible

9  causes to an effect is, in a market context, notoriously

10 difficult, because multiple actors can affect a market

11 simultaneously.  See San Diego Cnty. Gun Rights Comm. v.

12 Reno, 98 F.3d 1121, 1130 (9th Cir. 1996) (citing Common

13 Cause v. Dep't of Energy, 702 F.2d 245, 251 (D.C. Cir.

14 1983)).  To be sure, it may be difficult, but it is not

15 impossible.

16

17     In Barnum Timber, Barnum, the plaintiff, alleged that

18 when the Environmental Protection Agency designated

19 Redwood Creek as impaired by effluent, it lowered the

20 value of Barnum's adjacent property.  633 F.3d at 896.

21 The district court dismissed Barnum's complaint, finding

22 it lacked standing to sue.  Id. at 896-97.  On appeal,

23 the Ninth Circuit found Barnum pled standing

24 successfully, contrasting the case with San Diego County;

25 in that case "the plaintiffs contested government action

26 that affected entire markets and correspondingly alleged

27 price increases to the market as a whole, in which they

28

merely hoped to be buyers." Id. at 900.  Barnum, on the
other hand, alleged "that the economic value of its
property has been affected by the government action on an
adjoining waterway[,] leav[ing] open the possibility that
Barnum could isolate the effects of the government action
on its property." Id. (emphasis in original).

Further, the Ninth Circuit recognized Barnum's
allegations and the declarations supporting them
"offer[ed] a commonsense assessment of the market for
real property," i.e., that "regulatory restrictions on
one property that affect the uses to which a second
property can be put will lower the second property's
value." Id.  Additionally, the court did not require
Barnum to "allege that EPA is the sole source of the
devaluation of its property."  As long as "Barnum has
alleged that at least EPA's listing of Redwood Creek has
affected the value of its property[,] [i]t need not
eliminate other contributing causes to establish its
standing." Id. at 901; see also Ocean Advocates v. U.S.
Army Corp. of Eng'rs, 402 F.3d 846, 860 (9th Cir. 2005)
(holding that even though "other factors may also cause
additional [oil] tanker traffic," the construction of a
dock extension, "when considered alone or in tandem with
other industrial projects in the . . . region, would
contribute" to the increased risk of an oil spill, the
alleged injury).

1    In this case, Plaintiffs allege a correlation between
2    the decline in value of a builder's houses in Riverside
3    County and the number of houses the builder sold to
4    buyers who financed 90 percent or more of the cost of a
5    house.  (See Dodaro SAC ¶ 47.)  They then allege that
6    Defendants sold a sufficient number of houses to such
7    buyers to cause a greater decline in value to their own
8    houses than prevailing economic factors would have
9    otherwise caused (see id. ¶ 49), and that Defendants did
10   in fact cause such an incremental decline in the value of
11   Plaintiffs' houses (see id. ¶ 75).

12

13   Plaintiffs correctly point out that they are not
14   required, at this time, to prove that Defendants' actions
15   actually caused the excessive devaluation of their houses
16   - indeed, it may later turn out that they are unable to
17   prove it, scuttling a portion of their case.  See Lujan,
18   504 U.S. at 561 (discussing the resolution of a party's
19   standing at trial).  For the time being, Plaintiffs must
20   only allege a non-tenuous connection between Defendants'
21   actions and their losses.  Justiciability doctrines (like
22   standing) do not exist simply to give defendants an
23   additional means of moving to dismiss cases on the
24   pleadings; they exist to "limit the business of federal
25   courts to questions presented in an adversary context and
26   in a form historically viewed as capable of resolution
27   through the judicial process."  Flast v. Cohen, 392 U.S.
28

83, 95 (1968).  In that light it becomes clear that Plaintiffs have alleged standing successfully.

In sum, Plaintiffs allege Defendants' sales of houses to droves of heavily leveraged buyers primed entire neighborhoods for economic devastation; Defendants sold Plaintiffs houses in those neighborhoods, and the values of those houses have been affected inordinately as a result.  The Court concludes that these allegations meet the threshold, at the pleading stage, of establishing Plaintiffs' standing to pursue relief for the diminution in the value of their houses.

**B.   Plaintiffs' Allegations Fail to Establish the Timeliness of Their Claims for Fraud, Negligent Misrepresentation, and False Advertising**

Next, the Court turns to Defendants' contention that Plaintiffs' claims for fraud, negligent misrepresentation, and false advertising are time-barred. (See Maya MTD at 21-23.)  The Court applies the relevant California statutes of limitations.  Bancorp Leasing & Fin. Corp. v. Agusta Aviation Corp., 813 F.2d 272, 274 (9th Cir. 1987).  In California, fraud claims are subject to a three-year statute of limitations, running from the time fraud is, or should have been, discovered (the so-called "discovery rule").  Cal. Civ. Proc. Code § 338(d); Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807-09 (2005).  A false advertising claim under California

1  Business and Professions Code §§ 17500, _et seq._, is
2  likewise subject to a three-year statute of limitations.
3  Cal Civ. Proc. Code § 338(a); StreamCast Networks, Inc.
4  v. Skype Techs., S.A., No. CV 06-391 FMC (Ex), 2006 WL
5  5441237, at *9 n.8 (C.D. Cal. 2006).  A negligent
6  misrepresentation claim, however, is subject to either a
7  two or three year limitations period, depending on the
8  essence of the conduct underlying the claim.  Fanucci v.
9  Allstate Ins. Co., 638 F. Supp. 2d 1125, 1133 (N.D. Cal.
10 2009); Ventura Cnty. Nat'l Bank v. Macker, 49 Cal. App.
11 4th 1528, 1530-31 (1996).  Under even a three-year
12 limitations period, the Court concludes Plaintiffs'
13 negligent misrepresentation claims, along with their
14 fraud and false advertising claims, are time-barred.
15
16     Plaintiffs Paul and Sandra Nakabayashi were the last
17 Plaintiffs to enter a purchase agreement to buy a house
18 from a Homebuilder, on August 16, 2006.  Plaintiffs'
19 Complaints were filed on September 3, 2009, a few weeks
20 beyond the three-year limitations period.  Consequently,
21 at first glance, all Plaintiffs' fraud, negligent
22 misrepresentation, and false advertising claims appear
23 time-barred.  Plaintiffs allege, however, that they "did
24 not become aware" of Defendants' fraud "until well within
25 two years prior to filing of the subject complaint, and
26 there was no reasonable way [Plaintiffs] would have
27 learned the information earlier than that time frame."
28

1   (Dodaro SAC ¶ 72.)  Defendants respond that this

2   conclusory allegation provides an insufficient basis to

3   invoke the discovery rule.   The Court agrees.

4

5       The discovery rule exists in fraud cases because a

6   fraud defendant's "deceptive conduct may prevent a

7   plaintiff from even _knowing_ that he or she has been

8   defrauded."  _Merck & Co., Inc. v. Reynolds_, 130 S. Ct.

9   1784, 1793 (2010) (emphasis in original).  Without the

10  discovery rule, if a defendant managed to conceal his

11  fraud throughout the limitations period, "'the law which

12  was designed to prevent fraud' could become 'the means by

13  which it is made successful and secure.'"  _Id._ at 1793-94

14  (quoting _Bailey v. Glover_, 88 U.S. (21 Wall.) 342, 349

15  (1875)).   The discovery rule therefore shifts the point

16  in time at which the limitations period runs from the

17  time when the defendant committed the fraud to the time

18  when the plaintiff discovered it – or should have

19  discovered it.  _Merck & Co._, 130 S. Ct. at 1794; _Fox_, 35

20  Cal. 4th at 807-07.

21

22

23

24

25

26

27

28

                              27

So the question becomes:  at what point should a plaintiff have discovered he or she was being defrauded? It is not always an easy question to answer.  <u>Compare</u> <u>Betz v. Trainer Wortham & Co., Inc.</u>, 519 F.3d 863, 865-78 (9th Cir. 2008) (Kozinski, C.J., dissenting from denial of reh'g en banc) (arguing that a securities fraud plaintiff who claimed to be defrauded into making an allegedly risk-free investment should have inquired into the possibility of fraud after receiving a statement showing a decline in the value of her investment) <u>with</u> <u>id.</u> at 878-79 (holding for the panel that there remained a factual question when said plaintiff was on notice of the alleged securities fraud), <u>vacated</u>, 130 S. Ct. 2400. In California, the limitations period begins to run when a plaintiff "has reason at least to suspect a factual basis for [a claim's] elements," <u>Fox</u>, 35 Cal. 4th at 807 (internal quotation omitted), though not in the "hypertechnical" sense, <u>id.</u>  Thus, "[r]ather than examining whether [a plaintiff] suspect[s] facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiff[] ha[s] reason to at least suspect that a type of wrongdoing has injured him." <u>Id.</u>

To invoke the discovery rule, a plaintiff "must specifically plead facts to show (1) the time and manner of discovery <u>and</u> (2) the inability to have made earlier

discovery despite reasonable diligence."  <u>Id.</u> at 808
(internal quotation omitted) (emphasis in original); <u>see,</u>
<u>e.g.</u>, <u>Lauter v. Anoufrieva</u>, 642 F. Supp. 2d 1060, 1099
(C.D. Cal. 2009) (applying <u>Fox</u>).  Plaintiffs have not
pled facts to show when and how they discovered
Defendants' alleged fraud; they pled only that the
triggering event happened sometime within the limitations
period.  (<u>See</u> Dodaro SAC ¶ 72.)

     The closest Plaintiffs come to pleading when they
discovered the alleged fraud is the allegation "[w]hen
the real estate bubble burst, the truth was revealed . .
. [i]t was only then that the inflated prices, and the
resulting damage, became clear."  (Dodardo SAC ¶ 3.)  But
"when the real estate bubble burst" is not a specific
point in time, or in any event, not one pled by
Plaintiffs.[7]

---

[7] To demonstrate the emptiness of the phrase "when
the real estate bubble burst," consider the following
details, which the Court provides only to emphasize the
necessity that Plaintiffs make a less conclusory
allegation:

     By early March 2006, both buyers and sellers were
wary of an impending downturn in the housing market.  <u>See</u>
Vikas Bijaj & David Leonhardt, <u>Hoping for Best in Home</u>
<u>Sales, 2 Sides Sit Tight</u>, N.Y. Times, Mar. 4, 2006, at
A1.  By the end of March, the Commerce Department
reported that in February "new-home sales fell 10.5
percent . . . , the biggest one-month decline in nine
years."  <u>Gains Are Slim in Week of Wariness on Fed's Next</u>
<u>Move</u>, N.Y. Times, Mar. 25, 2006, at C6.  Nevertheless,
the depth of the market's descent in Riverside and San
Bernardino Counties was, by the end of March, still a
matter of speculation in some venues, which reported on a
                                        (continued...)

1    At the March 5, 2012, hearing on Defendants' Motions,

2 Plaintiffs argued that a holding of the court of appeals,

3 in <u>Cervantes v. Countrywide Home Loans, Inc.</u>, 656 F.3d

4 1034 (9th Cir. 2011), relieves them of the burden of

5 pleading facts sufficient to invoke the discovery rule,

6 and instead places the burden on Defendants to prove that

7 Plaintiffs' claims are time-barred.  <u>Cervantes</u>, however,

8 dealt with the equitable tolling of a statute of

9 limitations that indisputably began to run when the

10 plaintiffs executed loan documents, 656 F.3d at 1045-46;

11 this case presents the different question of when the

12 statute of limitations began to run in the first place.

13

14

15

16 ─────────────────

17    [7](...continued)
"cooling" market (as opposed to a collapsing one).  <u>See</u>
18 Josh Brown, <u>Study Forecasts Slower Growth in California</u>
<u>Economy</u>, The Press-Enterprise (Riverside, CA), Mar. 29,
19 2006, <u>available at</u> 2006 WLNR 5210688.

20    By October 2006, however, one forecast predicted
"home prices in Riverside and San Bernardino counties
21 will fall 11.4 percent from their peak earlier" in the
year, and that "by late 2008, the . . . region will have
22 experienced among the steepest declines of 379
metropolitan areas in the country and will be among 20
23 areas where prices for single-family homes on the resale
market will fall by double digits."  <u>Sharp Drop Forecast</u>
24 <u>for Inland Housing Prices</u>, The Press-Enterprise, Oct. 4,
2006, <u>available at</u> 2006 WLNR 17198198.  In November,
25 sales were down "21 percent in San Bernardino County and
24 percent in Riverside County from a year earlier," but
26 still, the median prices of houses in both counties were
higher than they had been the year before.  Leslie
27 Berkman, <u>Incentives Thrown in to Sell Homes</u>, The Press-
Enterprise, Nov. 15, 2006, <u>available at</u> 2006 WLNR
28 19798525.

Nevertheless, the Court considers Plaintiffs' broader point, _i.e._, that Plaintiffs do not bear the burden of disproving an affirmative defense – here, that the statute of limitations has run on their claims; instead, Defendants bear the burden of proving it.  See <u>Tovar v. U.S. Postal Serv.</u>, 3 F.3d 1271, 1284 (9th Cir. 1993) ("In every civil case, the defendant bears the burden of proof as to each element of an affirmative defense.") Defendants, however, met that burden, as the Second Amended Complaints set forth, on their faces, the times – beyond the limitations period – at which Plaintiffs entered into purchase agreements with Defendants. Plaintiffs therefore bear the burden of alleging their claims accrued at some other time, _i.e._, the time at which they discovered the fraud.  See, e.g., <u>Hopkins v. Dow Corning Corp.</u>, 33 F.3d 1116, 1120 (9th Cir. 1994) ("To invoke the discovery rule, <u>plaintiff must plead facts</u> which show '(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'") (quoting <u>Saltier v. Pierce Bros. Mortuaries</u>, 81 Cal. App. 3d 292, 297 (1978)) (emphasis added).

Accordingly, the Court dismisses Plaintiffs' fraud, negligent misrepresentation, and false advertising claims.  The Court does so without leave to amend, because as is discussed immediately below, amendment

would be futile; Plaintiffs' claims all fail on their merits.  See C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist., 654 F.3d 975, 985 & n.5 (9th Cir. 2011) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)) (noting that leave to amend may be denied properly if amended would be futile).

**C.   Plaintiffs Fail to State Claims for Fraud**

Defendants attack Plaintiffs' fraud claims by arguing first that they are not pled with the requisite specificity, and then that the claims fail as a matter of law, in any event.  The Court takes these arguments in turn.

> **1.   Plaintiffs' Fraud Claims Are Pled With the Necessary Specificity**

Defendants argue Plaintiffs fail to plead their fraud claims with the required degree of particularity.  (See Stephens MTD at 6-8; Oneto MTD at 7-10; Maya MTD at 23-24; Nielsen MTD at 8-10; Kelly MTD at 17-20.)  While the issue is close, ultimately the Court disagrees; Plaintiffs have pled at least some fraudulent acts with the requisite particularity.

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b). Rule 9 applies not just to a claim denominated "fraud,"

but also to other claims that arise from "a unified course of fraudulent conduct."  <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125 (9th Cir. 2009).  Pleading fraud with particularity requires a plaintiff to state "'the who, what, when, where, and how' of the misconduct charged," <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal citation omitted), as well as "'what is false or misleading'" about an allegedly false statement, "'and why it is false,'" <u>id.</u> (quoting <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1548 (9th Cir. 1994)).  Ultimately, the purpose of requiring particularized pleadings is threefold:  (1) to give defendants adequate notice of what representations they are expected to defend "and deter plaintiffs from the filing of a complaint 'as a pretext for the discovery of unknown wrongs'"; (2) to protect the reputations of fraud defendants; and (3) to prevent plaintiffs "'from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'"  <u>Kearns</u>, 567 F.3d at 1125 (internal citation omitted).

     In this case, each of Plaintiffs' claims arises from what is alleged to be a unified course of fraudulent conduct, and indeed each claim is at its heart a fraud claim – with the exception of the claim for breach of the covenant of good faith and fair dealing.  Thus, with the

33

exception of the claim for breach of the covenant of good
faith and fair dealing, each of Plaintiffs' claims is
subject to Rule 9(b)'s pleading requirements.[8]  With that
in mind, the Court turns to the relevant allegations.

Plaintiffs allege Defendants' marketing brochures
advertised "[l]arge homes with large number [sic] of
bedrooms," "providing '[g]enerous proportions' for
'family spaces,' and that nearby schools would 'assure .
. . family's needs.'"  (Dodaro SAC ¶ 31.)  One Plaintiff,
by way of example, received materials stating that his
neighborhood would include "'two parks and an inviting
recreational center' . . . located near 'fine Beaumont

_____

[8] Plaintiffs contend that in addition to their claim
for breach of the covenant of good faith and fair
dealing, portions of their claims under California
Business and Professions Code §§ 17200, et seq., are also
exempt from Rule 9(b)'s requirements.  Plaintiffs point
specifically to their allegations that in addition to
being fraudulent, Defendants' conduct was unlawful,
because it violated California Civil Code §§ 1709-10, and
unfair, because it "offend[ed] legislative intent
regarding income verification, as set forth in 66 Fed.
Reg. 65604-01 (2001)."  (Dodaro SAC ¶ 104.)  These
arguments lack merit.  Sections 1709 and 1710 create
liability for the act of "fraudulent deceit,"
unquestionably a species of fraud to which Rule 9(b)
applies.  See, e.g., Nuñag-Tanedo v. E. Baton Rouge
Parish Sch. Bd., 790 F. Supp. 2d 1134, 1141-43 (C.D. Cal.
2011) (applying Rule 9(b) to California Civil Code §
1709).  Inasmuch as the pages of the Federal Register
cited by Plaintiffs discuss any regulations, those
regulations are meant to protect borrowers from predatory
lending, "excluding home-purchase loans."  66 Fed. Reg.
65601, 65605 (Dec. 20, 2001) (emphasis added).  Here, any
"unqualified" borrowers received home-purchase loans;
Defendants therefore did not engage in the unfair conduct
Plaintiffs allege, regardless whether Rule 9(b) applies
or not.  (See infra Section F.)

1  public schools, [and] new shopping and dining . . . .'"
2  (Id. ¶ 58.)

3

4      Further, Plaintiffs were presented with agreements
5  containing statements akin to this one:  "'Seller desires
6  to sell the Property only to a buyer who will occupy the
7  Property as that buyer's principal residence.'"  (Id. ¶
8  59.)  The reason for this "desire," another sales
9  document stated, was "'to maintain a stabilized community
10 of owner-occupied homes.'"  (Id. ¶ 61.)  Provisions by
11 which Plaintiffs authorized Defendants to "'communicate
12 directly with'" their mortgage lenders "'for purposes of
13 determining Buyer's ability to obtain loan approval and
14 confirm that Buyer has sufficient funds to close Escrow"
15 led Plaintiffs to believe Defendants "would ensure that
16 only qualified buyers would purchase homes in the
17 community."  (Id. ¶ 62.)

18

19     Defendants argue that allegations like this fail to
20 meet Rule 9's particularity requirements, because they do
21 not set forth explicitly the who, what, when, where, and
22 how of the alleged fraud.  (See, e.g., Nielsen MTD at 8-
23 10.)  On one hand, Defendants are correct that Plaintiffs
24 do not identify precisely the marketing materials in
25 which the allegedly false statements are contained, nor
26 do they allege who gave them those materials, nor when.
27 On the other, printed marketing materials are not
28

ephemeras; they are not the representations of a faceless agent, known only by a first name, made over the telephone at a time since forgotten – and now relied upon by a plaintiff to accuse the agent's principal of fraud. This is true, to a greater extent, for statements allegedly contained in agreements executed by Plaintiffs at an identifiable point in time.  (See, e.g., Dodaro SAC ¶¶ 56, 57, 59, 61.)

     That is not to say Plaintiffs meet the Rule 9(b) standard throughout their pleadings; there is nothing, for instance, to indicate what is false or misleading about the statement that a neighborhood will include "'two parks and an inviting recreational center'" (id. ¶ 58).  The Rule is, however, satisfied by documents expressing Defendants' desire to populate a neighborhood with owner-occupied residences, coupled with Plaintiffs' allegations that Defendants had no such intent – and only said they did to entice Plaintiffs to buy houses.  At bottom, Rule 9(b) is meant to force plaintiffs to make allegations "'specific enough to give defendants notice of the particular conduct which is alleged to constitute the fraud charged so that they defend against the charge and not just deny that they have done anything wrong.'" Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993) (quoting Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985)).  In this case, Plaintiffs' pleadings give

Defendants sufficient information to defend against
Plaintiffs' claims effectively.  Plaintiffs thus succeed
in apprising Defendants of their alleged wrongdoing, but
as the Court will now discuss, Defendants' alleged bad
acts are not culpable conduct as a matter of law.

### 2.   Plaintiffs' Fraud Claims Nevertheless Fail on their Merits

In California, the elements of a fraud claim are:
"(1) a misrepresentation (false representation,
concealment, or nondisclosure); (2) knowledge of falsity
(or scienter); (3) intent to defraud . . . ; (4)
justifiable reliance; and (5) resulting damage."
Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979,
990 (2004).  If a fraud claim relies on a defendant's
concealment of a fact, the defendant must have had a duty
to disclose the particular information that he allegedly
concealed.  Hahn v. Mirda, 147 Cal. App. 4th 740, 748
(2007).  Plaintiffs contend that Defendants both
affirmatively misrepresented the character of the
neighborhoods in which they were selling houses, and
concealed (or failed to disclose) the presence of
unqualified buyers (i.e., foreclosure risks).  (See,
e.g., Dodaro SAC ¶¶ 62, 70.)  Defendants respond that
Plaintiffs could not justifiably rely on the alleged
misrepresentations, because those representations were
puffery, and the contracts signed by Plaintiffs
foreclosed reliance on those statements, in any event.

1  Defendants also argue that they had no duty to disclose
2  the presence of so-called unqualified buyers.  Defendants
3  are correct on both points.

4
          **a.  Defendants' Alleged Misrepresentations Are**
5              **Largely, if not Wholly, Puffery**

6      "[A] general, subjective claim about a product is
7  non-actionable puffery."  <u>Newcal Indus., Inc. v. Ikon</u>
8  <u>Office Solution</u>, 513 F.3d 1038, 1053 (9th Cir. 2009).  "A
9  statement that is quantifiable, that makes a claim as to
10 the 'specific or absolute characteristics of a product,'"
11 however, is not.  <u>Id.</u> (quoting <u>Cook, Perkiss, & Liehe v.</u>
12 <u>N. Cal. Collection Serv., Inc.</u>, 911 F.2d 242, 245 (9th
13 Cir. 1990)); <u>see</u> <u>Sterling Drug, Inc. v. Fed. Trade</u>
14 <u>Comm'n</u>, 741 F.2d 1146, 1150 (9th Cir. 1984) (noting that
15 puffery consists of claims that "are either vague or
16 highly subjective"); <u>Sensible Foods, LLC v. World</u>
17 <u>Gourmet, Inc.</u>, No. 11-2819 SC, 2012 WL 566304, at *6
18 (N.D. Cal. Feb. 21, 2012) ("Actionable statements are
19 'capable of being proved false or of being reasonably
20 interpreted as a statement of objective fact.'") (quoting
21 <u>Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.</u>,
22 173 F.3d 725, 731 (9th Cir. 1999)).

23

24     Plaintiffs stake their allegations of reliance on
25 statements regarding the "stability" of Defendants'
26 neighborhoods, but there is nothing quantifiable,
27 falsifiable, specific, or absolute about the terms
28

"stability" or "stable."[9]  Here, it appears that the
standard by which Plaintiffs would measure their
neighborhoods' stability appears to be the number of
unqualified buyers (*i.e.*, subprime mortgagors or
investors) in the neighborhood, or perhaps the number of
completed or pending non-judicial foreclosures.  The
Second Amended Complaints plead only the bald conclusion
that Plaintiffs' neighborhoods are unstable.

Plaintiffs protest that Defendants' statements about
stability are neither general nor subjective claims; in
support of their argument, they cite Continental
Airlines, Inc. v. McDonnell Douglas Corp., 216 Cal. App.
3d 388 (1989).  (Opp'n ("Kelly Opp'n") (Case No. 09-1674,
Doc. No 72) at 4.)  In that case, the plaintiff,
Continental Airlines, purchased DC-10 aircraft from the
defendant, McDonnell Douglas, based in part on
representations that "'[t]he fuel tank will not rupture
under crash load conditions'; that the landing gear 'are
designed for wipe-off without rupturing the wing fuel
tank'" and "that 'the support structure is designed to a
higher strength than the gear to prevent fuel tank
rupture due to accidental landing gear overload.'"

---

[9] Thus, in another context:  "I find the statements
that the Company's sales force was 'stable, large,
experienced,' and 'very successful' to fall on their face
within the penumbra of non actionable 'puffing.'"  In re
Boston Scientific Sec. Litig., No. 10-10593-DPW, 2011 WL
4381889, at *11 (D. Mass. Sept. 19, 2011).

1  Continental Airlines, 216 Cal. App. 3d at 400 (brackets

2  in original).   Continental sued McDonnell Douglas after,

3  on one flight, "two tires burst on the left landing

4  gear," causing the gear to "br[e]ak through the tarmac,

5  burrow[] into the ground, and [be] ripped from the wing,

6  making a 3.7 foot hole which allowed fuel to pour from

7  the wing fuel tanks."  Id. at 399.   In sum, an airplane

8  manufacturer represented specifically that the collapse

9  of its aircrafts' landing gear would not rupture their

10  fuel tanks, but that is precisely what happened.   The

11  level of specificity in McDonnell Douglas's

12  misrepresentation, quoted above, is an order of magnitude

13  apart from the level of specificity in Defendants' use of

14  the word "stable."

15

16          **b.   Plaintiffs' Purchase Agreements Foreclose
17               Reliance on Defendants' Allegedly Fraudulent
               Representations**

18       Defendants further contend that the purchase

19  agreements Plaintiffs signed prevent Plaintiffs from

20  relying reasonably on the statements Plaintiffs now

21  allege are fraudulent.[10]

22  _____

23       [10] Insofar as some of the allegedly fraudulent
    representations are contained in the purchase agreements
24  themselves, the Court questions whether Defendants'
    alleged failure to make good on them gives rise to a
25  fraud claim at all (rather than a breach of contract
    claim).   See Garza v. Gruma Corp., No. C 07-02092 JW,
26  2009 WL 2136930, at *6 (N.D. Cal. July 16, 2009) ("A
    claim that is based on a promise made in a contractual
27  agreement is actionable as a breach of contract, not as a
    claim for fraud.") (citing Stop Loss Ins. Brokers, Inc.
28                                        (continued...)

1      For instance, Plaintiff James Dodaro signed an

2 "Occupancy Agreement" requiring him to occupy his new

3 house as his primary residence for a year, fortifying his

4 understanding that other houses in the neighborhood would

5 be owner-occupied.  (<u>See</u> Dodaro SAC ¶ 60.)  Defendant

6 Standard Pacific Corp. filed a copy of a "Use and

7 Occupancy Addendum" signed by Mr. Dodaro, in which he

8 agreed to use his house as his principal residence, and

9 for one year from the close of escrow, not to (among

10 other things) sell or rent his house to someone else.

11 (See Ex. B to Dodaro MTD (Case No. 09-1666, Doc. No. 78-

12 3).)[11]  If Mr. Dodaro breached that agreement, Standard

13 Pacific would be entitled to damages, including "the

14 amount of the appreciation" of Mr. Dodaro's house between

15 the time Mr. Dodaro purchased the house and the time he

16 sold it (assuming the breach was a sale).  (<u>Id.</u>)

17 Crucially, the agreement contains a disclaimer of third-

18 party beneficiaries:  "[t]here are no third party

19 beneficiaries to this Use and Occupancy Addendum."  (<u>Id.</u>)

20

21

22

23

_____

24    [10](...continued)

25 <u>v. Brown & Toland Med. Group</u>, 143 Cal. App. 4th 1036,
1041 (2006)).

26

27    [11] The Court takes judicial notice of Plaintiffs'
purchase documents, as their Second Amended Complaints
refer to, and rely on, them.  <u>Swartz v. KPMG LLP</u>, 476

28 F.3d 756, 763 (9th Cir. 2007).

With the Use and Occupancy Addendum, Mr. Dodaro, and every other buyer who signed the same addendum, made a promise to Standard Pacific to live in his or her house for a year.  But all the buyers also agreed that none was the beneficiary of another's agreement.  Thus, no buyer had a remedy against another buyer for selling his house less than a year after buying it, and none was in a position to sue Standard Pacific over another buyer's breach of the agreement.[12]

Likewise, Defendant Lennar Corp. submitted agreements signed by Plaintiff Stella Stephens and Plaintiff Timothy Young, both of whom promised Lennar they would occupy their houses for one year.  (See Exs. A-D to Request for Judicial Notice ("RJN") (Case No. 09-1668, Doc. No. 76).)  Both also agreed that Lennar could offer different terms to other buyers, however, presumably including a term relieving the other buyers from occupancy requirements, which in any event, by the contract's terms, "may be required" (and therefore may also not be required).  (See Ex. B to RJN at 38, 46-47.)

_____

[12] Even if a third-party beneficiary relationship existed, a suit against Standard Pacific would be an unusual outcome.  In the arrangement created by the Use and Occupancy Addendum, a buyer is the promisor, Standard Pacific the promisee, and other buyers are the putative third-party beneficiaries.  A third-party beneficiary may enforce the agreement of which he is the beneficiary against a promisor (i.e., another buyer), not a promisee (i.e., Standard Pacific).  Souza v. Westlands Water Dist., 135 Cal. App. 4th 879, 893 (2006).

1    Lennar also points to portions of the agreements
2  signed by Ms. Stephens and Mr. Young in which they
3  "acknowledge[d] that at no time has [Lennar] or any of
4  its sales associates, employees, or representatives made
5  any representation or warranties regarding tax benefits,
6  value, price appreciation or depreciation, or future
7  pricing adjustments," and further, "that the California
8  real estate market reacts to economic and other
9  conditions that may cause the price of housing to
10 fluctuate. . . .  At the sole discretion of [Lennar], and
11 without notice to [Plaintiffs], the purchase price [and]
12 terms of purchase . . . are subject to change from time
13 to time." (Id. at 46-47.)  Most critically, Lennar
14 disclaims any representation that it "will refrain from
15 any pricing program, product design program, development
16 strategy or marketing plan which in any manner adversely
17 affects the value of the Property." (Ex. A to RJN at
18 10.)
19
20    Another Defendant, D.R. Horton, Inc., filed an
21 agreement executed by Plaintiff Remedios Martinez, which
22 stated:
23
24         As Seller may have previously disclosed to
         you, even when the Occupancy Addendum was in
25       use, Seller could not guarantee that the Project
         would be entirely owner-occupied.  In addition,
26       Seller had no obligation to enforce the
         Occupancy Addendum.
27
28

1          Seller has now elected to discontinue using
2     the Addendum. . . .  Because Seller will no
      longer ask buyers to make these representations,
3     there is a possibility that there may be fewer
      owner-occupied residences within the Community.
      (Ex. 2 to Martinez MTD.)
4

5          Additionally, Defendants' agreements were fully

6     integrated, containing clauses to the effect of "[a]ll

7     prior statements and representations, whether oral or

8     written, are hereby superseded by this Purchase Agreement

9     . . . this Purchase Agreement shall constitute the

10    complete and exclusive statement of its terms."  (Ex. 1

11    to Martinez MTD at 10.)

12

13         From this foundation, Defendants argue that

14    Plaintiffs simply could not have relied reasonably on

15    representations made outside the four corners of the

16    agreements, particularly where those representations are

17    either contradicted or disclaimed by the agreements.

18

19         Plaintiffs argue in response that Defendants'

20    disclaimers are insufficient to make their reliance on

21    Defendants' alleged misrepresentations unreasonable.

22    (See Opp'n ("Nielsen Opp'n") (Case No. 09-1673, Doc. No.

23    65) at 17-18).)   Plaintiffs point to Broberg v. Guardian

24    Life Ins. Co. of Am., 171 Cal. App. 4th 912 (2009), in

25    which the court of appeal discussed the effectiveness of

26    disclaimers.  The court noted "[a] plaintiff will be

27    denied recovery only if his conduct is manifestly

28

44

unreasonable in the light of his own intelligence or
information.  It must appear that he put faith in
representations that were preposterous or shown by facts
within his observation to be so patently and obviously
false that he must have closed his eyes to avoid
discovery of the truth." Broberg, 171 Cal. App. 4th at
921-22 (brackets in original, internal quotations
omitted).

    In Broberg, a Dr. Powell relied on the
representations of an insurance salesman that a life
insurance policy would generate earnings sufficient to
cover the policy's premiums by the policy's 12th year.
Id. at 915.  Those statements were echoed in the
marketing materials for the policy; the policy itself had
"inconsistent language" on the point.  Id. at 916.  When
it turned out that the policy did not generate earnings
sufficient to cover its premiums, the trustees of Dr.
Powell's trust sued; the defendant, Guardian Life
Insurance Co., argued among other things that it
disclaimed effectively the representation that the policy
would pay for itself after 11 years.  The court of appeal
held that where the defendant buried disclaimers and
issued a policy illustration "contain[ing] deceptive
language and figures indicating Powell's out-of-pocket
payments will 'vanish,'" a court could not find the
disclaimers effective as a matter of law.  Id. at 922.

1    While _Broberg_'s analysis is relevant to this matter,
2  the facts in the present case do not compel _Broberg_'s
3  conclusion.  Here, most of the representations that
4  Plaintiffs took to mean, implicitly, that they were
5  buying houses in "stable" communities, surrounded by
6  "qualified" buyers, appear in the same documents as the
7  disclaimers.  There is no deceptive language, nor are
8  there deceptive pictures.  Instead, Plaintiffs allege to
9  have been given a deceptive impression of the nature of
10  their neighborhoods based on the straightforward terms of
11  their purchase agreements.  And unlike in _Broberg_, there
12  are no allegations – or at least, no allegations that
13  satisfy Rule 9(b) – that Plaintiffs were cajoled by oral
14  representations into seeing more in their purchase
15  agreements than what is actually there.

16

17    Consequently, the Court concludes that even if
18  Defendants made actionable representations, rather than
19  merely puffing, Defendants disclaimed those
20  representations effectively, sometimes in the very same
21  documents where the representations themselves appeared.
22  The Court therefore finds that Plaintiffs fail to state
23  fraud claims based on false representations.

24

25

26

27

28

### c. Defendants Had No Duty to Disclose the Presence or Concentration of "Unqualified" Purchasers

In California, "[a] seller of real property has a common law duty to disclose 'where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer. . . .'" <u>Alfaro v. Cmty. Housing Improvement Sys. & Planning Ass'n</u>, 171 Cal. App. 4th 1356, 1382 (2009) (quoting <u>Lingsch v. Savage</u>, 213 Cal. App. 2d 729, 735 (1963)).  Plaintiffs allege Defendants therefore owed them a duty to disclose that they were selling houses to "unqualified" buyers, as the presence of such buyers – or the wave of foreclosures following in their wake – diminished the value of Plaintiffs' property.  The Court disagrees with Plaintiffs.

Plaintiffs depict themselves as people "who did everything right," in juxtaposition with "unqualified and high-foreclosure-risk buyers."  (Dodaro SAC ¶ 45.)  From this premise, Plaintiffs argue Defendants had a duty to warn them of the presence of feckless debtors, as sure as they would have been obligated to warn of a neighbor who creates a nuisance by, for example, regularly pouring motor oil all over the roof of his house.  <u>See Alexander</u>

<u>v. McKnight</u>, 7 Cal. App. 4th 973, 976 (1992) (affirming the trial court's conclusion that the plaintiffs had a duty, on selling their house, to inform the buyer that their neighbors are nuisances).

     The Court declines to analogize an indebted neighbor to one who creates a noxious nuisance on his or her property.  Whatever risk one's neighbors' insolvency may pose to real property values, their debts do not besmirch them in the eyes of the law; "[i]nsolvency is often, maybe most often, simply the result of bad luck, and our society closed its debtors' prisons long ago." <u>Chapin v. Knight-Ridder, Inc.</u>, 993 F.2d 1087, 1094 (4th Cir. 1993). As the Court observed previously, subprime mortgages went generally to people who were cash-poor but house-rich (or became house-rich, if they got purchase-money mortgages). Those borrowers, and their lenders, took a permissible risk, in a skyrocketing housing market, even if it appears with the benefit of hindsight the creditors' (and debtors') profligacy was enormously misguided.

     Even if, as Plaintiffs argue, the presence of certain buyers (in this case, highly leveraged debtors) in a neighborhood materially affects the value or desirability of all the property therein, the Court's analysis does

1   not change.[13]   At what point does the presence or
2   concentration of such buyers mandate disclosure?   As
3   Defendants observe, Plaintiffs have yet to define
4   adequately whose presence Defendants were required to
5   make known, and what level of detail regarding those
6   buyers (or would-be buyers) Defendants should have
7   disclosed.   Plaintiffs respond that Defendants need not
8   have disclosed any particular person's financial
9   information, but instead that they "were obligated to
10  disclose their practice of selling homes to high-
11  foreclosure risk buyers, including subprime buyers, their
12  expectation as to how many of the homes would be sold to
13  such buyers, and the percentage of homes in the
14  development neighborhoods which were sold to such
15  buyers," as those sales "fraudulently . . . maintain[ed]
16  high prices in neighborhoods that, based on the buyers to
17  whom [Defendants] were selling, did not warrant those
18  prices."[14]   (Nielsen Opp'n at 8, 11.)

19
20
21
        [13] Given the basis for Plaintiffs' claims – that
22  Defendants had a duty to disclose sales to certain
    people, i.e., subprime mortgagors – Plaintiffs'
23  discussion of the duty to disclose "nuisances or other
    conditions of nearby properties" (Nielsen Opp'n at 4)
24  (emphasis added), is inapposite.   Subprime mortgagors are
    neither a nuisance nor a condition of real property.
25
        [14] That the presence of many subprime mortgagors
26  allegedly buoyed prices raises the question whether one
    must disclose hidden facts that increase the value of
27  property.   Unsurprisingly, there appears to be no case
    law on this issue, because few people sue when the value
28  of their property unexpectedly goes up.

                                49

In the absence of any authority imposing such a duty on sellers to disclose whether they are selling to "high-foreclosure risk buyers," the Court declines to create one here, particularly without any meaningful criteria delineating precisely who those buyers are. Moreover, such a duty would only apply, realistically, at the time of a house's first sale in a neighborhood owned entirely by one developer, with knowledge of how all the other houses were being financed, because once houses are placed for sale on the secondary market (or if their original buyers encumber them with additional mortgages), the developer has no way of knowing how many houses in its development are owned by "high-foreclosure risk buyers."[15]  And such a duty, if it applied to sellers, could impose a vast burden – unlike, for example, the duty to disclose that a murder occurred in a house, the sort of uncommon event a seller is required to disclose under <u>Reed v. King</u>, 145 Cal. App. 3d 261 (1983). <u>See</u> <u>Reed</u> 145 Cal. App. 3d at 267 (finding that "[m]urder is not such a common occurrence that <u>buyers</u> should be charged with anticipating and discovering this disquieting possibility," and thereby charging sellers with a duty to disclose it) (emphasis in original).

---

[15] That is, no way other than that equally available to the buyer:  searching for recorded deeds of trust.

50

1    Given these considerations, and beginning from the
2  premise that "[c]oncepts of real property are deeply
3  rooted in state traditions, customs, habits, and laws,"
4  Reconstr. Fin. Corp. v. Beaver Cnty., 328 U.S. 204, 209
5  (1946), the Court will leave the imposition of a duty to
6  disclose the presence and concentration of "high-
7  foreclosure risk buyers" to the California State
8  Legislature.[16]

9

10 **D.   Plaintiffs Fail to State a Claim for Negligent**
   **Misrepresentation**
11

12    A claim for negligent misrepresentation, like a claim
13 for fraud, requires "the misrepresentation of a past or
14 existing material fact" on which a plaintiff justifiably
15 relied.  Wells Fargo Bank, N.A. v. FSI, Fin. Solutions,
16 Inc., 196 Cal. App. 4th 1559, 1573 (2011) (internal
17 quotation omitted).  As the Court concludes Plaintiffs
18 fail to allege both misrepresentations and justifiable
19 reliance, their claims for negligent misrepresentation
20 fail.

21

22

23

24
_____

25    [16] Plaintiffs also argue that Defendants must
   disclose the presence of "high foreclosure-risk buyers"
26 to rehabilitate the misrepresentations they allegedly
   made about the stability of Plaintiffs' neighborhoods.
27 (See Nielsen Opp'n at 11-12.)  As the Court concludes
   Defendants made no misrepresentations about stability,
28 Plaintiffs' argument fails.

1  **E.  Plaintiffs Fail to State Claims for False Advertising**
2  **Under California Business and Professions Code §§**
   **17500, et seq.**

3     Plaintiffs' claims for false advertising under

4  California Business and Professions Code §§ 17500, _et_

5  _seq._, fail for the same reason their claims of fraud

6  based on affirmative misrepresentations fail:

7  Defendants' allegedly misleading assertions, _e.g._, of

8  "stability," or family-orientation, are too vague to be

9  actionable under Section 17500.  _See, e.g._, _Williams v._

10 _Gerber Prods. Co._, 552 F.3d 934, 939 n.3 (9th Cir. 2008)

11 (positing the statement that fruit snacks are

12 "nutritious" could constitute puffery, "since

13 nutriousness can be difficult to measure concretely").

14

15 **F.  Plaintiffs Also Fail to State Claims for Unfair**
16 **Competition under California Business and Professions**
   **Code §§ 17200, et seq.**

17    California's Unfair Competition Law ("UCL"), Cal.

18 Bus. & Prof. Code §§ 17200, _et seq._, establishes three

19 varieties of unfair competition:  engaging in acts that

20 are unlawful, engaging in acts that are unfair, and

21 engaging in acts that are fraudulent.  _Cel-Tech Commc'ns,_

22 _Inc. v. L.A. Cellular Tel. Co._, 20 Cal. 4th 163, 180

23 (1999).  Plaintiffs allege Defendants engaged in all

24 three varieties of violations.  Defendants allegedly

25 engaged in unlawful activity by violating California

26 Civil Code § 1709; allegedly engaged in fraudulent

27 activity by failing "to disclose material facts about the

28

communities in which [Plaintiffs'] home[s] would be
located, and misrepresent[ing] the nature of those
communities"; and allegedly engaged in unfair activity by
"process[ing] loans for buyers that falsified and
inflated unverified income."  (Dodaro SAC ¶ 104.)

     The unlawful activity in which Defendants allegedly
engaged, i.e., violations of California Civil Code §
1709, consists of "willfully deceiv[ing] another with
intent to induce him to alter his position to his injury
or risk," Cal. Civ. Code § 1709 - in other words,
committing fraud.  See Express, LLC v. Fetish Group,
Inc., 464 F. Supp. 2d 965, 971-72 (C.D. Cal. 2006)
(setting forth the elements of "fraudulent deceit" under
Section 1709; they are the elements of common-law fraud).
Given the Court's conclusion that Plaintiffs fail to
state claims for fraud, their UCL-unlawful activity
claims, premised on fraud, fail.

     The fraudulent activity in which Plaintiffs allege
Defendants engaged is run-of-the-mill fraud; however,
Plaintiffs can show a violation of the UCL without
satisfying all of the elements ordinarily necessary to
prove fraud.  Fraudulent activity under the UCL, "'unlike
common law fraud, can be shown even if no one was
actually deceived, relied upon the fraudulent practice,
or sustained any damage.'"  StreamCast Networks, Inc. v.

IBIS LLC, No. CV 05-04239 MMM (Ex), 2006 WL 5720345, at *11 (C.D. Cal. May 2, 2006) (quoting Prata v. Sup. Ct., 91 Cal. App. 4th 1128, 1146 (2001)).  Instead, a plaintiff "need only show that 'members of the public are likely to be deceived.'"  Searle v. Wyndham Int'l, Inc., 102 Cal. App. 4th 1327, 1333 (2002) (internal citation omitted).  Thus, rather than asking whether a person's reliance on Defendants' alleged representations was reasonable, the Court now asks whether a reasonable member of the public is likely to be deceived by Defendants' representations.  See Williams, 552 F.3d at 938 (observing that the reasonable consumer standard applies to claims under the UCL).  The Court concludes that a reasonable member of the public would not be deceived by Defendants' puffery, for the same reason that Plaintiffs' reliance on that puffery would be unjustified:  the allegedly deceptive statements are so subjective as to be almost entirely devoid of meaning.

Lastly, the unfair activity Plaintiffs allege is Defendants' improper verification of the income of various other borrowers, in violation of the policy set forth in 66 Fed. Reg. 65601.  Plaintiffs' unfair activity claim is misplaced, as the California courts interpret the "unfair activity" prong of the UCL to address "unfair methods of competition"; that is, "action[s] by a competitor" in a case where the plaintiff is "alleging

anticompetitive practices."  <u>Cal-Tech Commc'ns</u>, 20 Cal.
4th at 186-87 & n.12.  Consumers, like Plaintiffs, are
limited to actions "alleging other kinds of violations of
the unfair competition law such as 'fraudulent' or
'unlawful' business practices or 'unfair, deceptive,
untrue or misleading advertising.'"  <u>Id.</u>, at 187 n.12.
Further, as discussed in note 8, <u>supra</u>, the policy set
forth in 66 Fed. Reg. 65601 does not apply to purchase-
money mortgages; consequently, it does not apply to the
loans Defendants were making.

     The Court therefore concludes Plaintiffs fail to
state a claim under the UCL.

**G.  On Plaintiffs' Facts, There is No Breach of the
     Covenant of Good Faith and Fair Dealing**

     Lastly, Plaintiffs raise a claim for breach of the
covenant of good faith and fair dealing.  An implied
"covenant of good faith is read into contracts in order
to protect the express covenants or promises of the
contract, not to protect some general public policy
interest not directly tied to the contract's purpose."
<u>Foley v. Interactive Data Corp.</u>, 47 Cal. 3d 654, 690
(1988).  "'[T]he covenant is implied as a <u>supplement</u> to
the express contractual covenants, to prevent a
contracting party from engaging in conduct which (while
not technically transgressing the express covenants)

frustrates the other party's rights to the benefits of the contract.'"  <u>Racine & Laramie, Ltd. v. Dep't of Parks & Rec.</u>, 11 Cal. App. 4th 1026, 1031-32 (1992) (quoting <u>Love v. Fire Ins. Exch.</u>, 221 Cal. App. 3d 1136, 1153 (1990)) (emphasis in original).  While the covenant of good faith and fair dealing supplements express contractual covenants, it remains tethered to them; it "is limited to assuring compliance with the <u>express terms</u> of the contract, and cannot be extended to create obligations not contemplated by the contract."  <u>Pasadena Live, LLC v. City of Pasadena</u>, 114 Cal. App. 4th 1089, 1094 (2004) (emphasis in original).

Here, Plaintiffs attempt to divert the covenant of good faith and fair dealing from its purposes, thereby saddling Defendants with obligations they bargained expressly not to undertake.  Plaintiffs allege their purchase agreements with Defendants obligated Defendants to "build and sell to [a Homeowner] a home in the community identified in the agreement" (Dodaro SAC ¶ 129), but Defendants sullied the communities by "selling houses to subprime borrowers and investors" (Dodaro SAC ¶ 131).  Indeed, Plaintiffs allege, even if the houses they received were "not yet in a community materially worse than represented, the community [Defendants] ultimately delivered was worse than represented."  (Dodaro SAC ¶ 133.)

1     Plaintiffs recognize, as they must, that Defendants
2 reserved expressly the rights to, _e.g._, implement "a
3 pricing program, product design program, development
4 strategy or marketing plan which in any manner adversely
5 affects the value of the Property." (Ex. A to RJN at
6 10.)  Defendants promised Plaintiffs a wide variety of
7 amenities while reserving this right, and there is no
8 allegation that Defendants failed to deliver on any
9 contractual items that were promised explicitly.
10 Instead, Plaintiffs allege that Defendants exercised the
11 discretion reserved to them in bad faith by selling
12 houses to investors and subprime mortgagors.  Accepting
13 that argument, however, swallows an express provision of
14 the contract for which Defendants bargained:  that they
15 could sell houses to whomever they wanted, at whatever
16 price they wanted, even if such sales affected the values
17 of Plaintiffs' houses adversely.  On Plaintiffs'
18 allegations, the Court thus can find no breach of the
19 covenant of good faith and fair dealing.
20
21                    **IV. CONCLUSION**
22     For the foregoing reasons, the Court finds as
23 follows:
24 1.  Plaintiffs allege causation sufficiently to establish
25      standing to bring claims for damages stemming from
26      the diminished value of their houses;
27
28

2.  Plaintiffs allege some fraudulent acts with the degree of specificity required under Federal Rule of Civil Procedure 9(b);

3.  Plaintiffs' claims for fraud, negligent misrepresentation, and false advertising are time-barred;

4.  Plaintiffs shall not have leave to amend those claims, as they fail on their merits;

5.  Plaintiffs' claims for violations of the UCL and for breach of the covenant of good faith and fair dealing also fail;

6.  Plaintiffs' Second Amended Complaints are therefore DISMISSED without leave to amend;

7.  Defendants' Motions to Strike are DENIED as MOOT.

Dated: <u>March 26, 2012</u>

_____
VIRGINIA A. PHILLIPS
United States District Judge